CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

AUG 0 8 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **REGINA WARREN,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00003 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand this case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, Regina Warren, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Warren's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Warren filed her application for DIB on or about February 8, 2005, alleging disability as of May 31, 2004, due to major depression, hearing loss and obesity. (Record, ("R."), at 16, 47, 67, 70.) The claim was denied initially and upon reconsideration. (R. at 13-24, 26-27, 32-34, 57-61.) Warren then requested a hearing before an administrative law judge, ("ALJ"). (R. at 35.) The ALJ held a hearing on January 22, 2007, at which Warren was represented by counsel. (R. at 247-79.)

By decision dated March 16, 2007, the ALJ denied Warren's claim. (R. at 16-24.) The ALJ found that Warren met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2009, and that she had not engaged in substantial gainful activity since May 31, 2004, the alleged onset date. (R. at 18.) The ALJ determined that the medical evidence established that Warren suffered from a severe impairment, namely a depressive disorder; however, he found that Warren did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ found that Warren retained the residual functional capacity to perform simple work at the

2

medium[1] level of exertion. (R. at 19.) Further, the ALJ determined that Warren was unable to perform her past relevant work as a day care director, a town clerk or a secondary teacher. (R. at 22.) Thus, the ALJ concluded that Warren was not under a disability as defined in the Act, and that she was not entitled to benefits. (R. at 24.). *See* 20 C.F.R. § 404.1520(g) (2008).

After the ALJ issued his decision, Warren pursued her administrative appeals, (R. at 11-12), but the Appeals Council denied her request for review, (R. at 5-8). Warren then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2008). This case is before the court on Warren's motion for summary judgment, which was filed on June 4, 2008, and on the Commissioner's motion for summary judgment, which was filed on July 1, 2008.

## II. Facts

Warren was born in 1949, which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c) (2008). (R. at 23, 67.) According to the record, Warren achieved a Masters degree. (R. at 250.). Warren has past work experience as a teacher, a videographer, a clerk treasurer, a librarian, a childcare director and a bank teller. (R. at 71-72, 251-55.)

At the hearing before the ALJ on January 22, 2007, Warren testified that she

---

[1]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2008).

3

continued to work as a videographer since the onset of her disability, and that she would occasionally video tape weddings and reunions. (R. at 250.) She testified that she had someone that helped her with the videotaping "in case [she did not] feel well enough." (R. at 250.) She also testified that she had previously taught school, but stopped teaching because her "abilities were [] limited [and she] broke down and cried in class." (R. at 252.) She stated that she finished out the school year, but was only able to work half a day because of her problems. (R. at 253.) Warren also testified that she previously worked part-time at a community college, where she taught a computer class to the elderly. (R. at 253.) Additionally, she testified that she worked as a clerk treasurer, that she worked part-time in a library and that she worked as a childcare director and as a bank teller. (R. at 254-55.)

Warren stated that she was unable to work a full-time job because of an eating disorder and because her mental health "progressively got worse." (R. at 256.) She testified that she took antidepressant medication and underwent counseling, but that it was still "so hard for [her] to be around people . . . and [that she felt] unsafe." (R. at 256.) Warren testified that she felt overwhelmed and unfocused and that it took her a great deal of time to finish a task. (R. at 257.) She reported that she had "bad days" a couple of days a week, which caused her to stay in bed. (R. at 259-60.) She also testified that she had irregular sleep, possibly due to a side effect of her medication. (R. at 259.) She stated, moreover, that she had sleep apnea, and that she used a continuous positive airway pressure machine, ("CPAP"), to help her breathe while she slept. (R. at 260-61.) She testified that she took Cymbalta, Celexa and Ativan for her emotional problems. (R. at 258.)

4

Thomas Edward Schacht, Psy.D., a medical expert, also was present and testified at Warren's hearing. (R. at 265.) Schacht testified that it was "unfortunate" that Warren had only been treated by her medical doctor and not by a psychiatrist. (R. at 266.) He testified that he was unsure why Warren's social worker diagnosed her with bipolar disorder, because the evidence did not suggest bipolar disorder. (R. at 266.) Schacht stated that the social worker did not know "what [she was] talking about." (R. at 266.) He stated that even though Warren was diagnosed with bipolar disorder, she was prescribed antidepressants, which could make such a disorder worse. (R. at 267.) Schacht also disagreed with the information in exhibit 13F,[2] and stated that he felt the form was biased and not psychometrically balanced. (R. at 267-68.) He further testified that Warren's therapist's reports appeared to be consistent with a person who had a mild impairment and who had a positive response to treatment and that exhibit 14F[3] was internally inconsistent. (R. at 268, 270-72.)

Robert S. Spangler, Ph.D., a vocational expert, also was present and testified at Warren's hearing. (R. at 273-79.) Spangler classified Warren's past relevant work as a day care director as sedentary[4] and skilled work, as a town clerk as sedentary to light[5]

---

[2]Exhibit 13F is a Mental Residual Functional Capacity Questionnaire dated January 3, 2007, completed by Anne Jacobe, LCSW. (R. at 217-22.)

[3]Exhibit 14F are progress notes covering the period from October 18, 2005, to November 28, 2006, completed by Anne Jacobe. (R. at 223-27.)

[4]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2008).

[5]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he can also perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2008).

5

and semiskilled work, as an adjunct professor at a community college as not relevant and classified her work as a secondary teacher as light and skilled, but specific to a professional education. (R. at 274.) Spangler also testified that Warren had no transferable skills. (R. at 274.) Spangler was asked to assume a hypothetical individual, with the same age, education level and work experience as Warren, who was capable of performing medium work. (R. at 274.) Spangler testified that there would be a significant number of jobs available in the national and regional economies for such an individual. (R. at 275.) Spangler also testified that a significant number of jobs would be available for an individual who was able to perform work at the medium level of exertion, but was limited to simple work. (R. at 276.) Spangler testified that an individual, whom possessed the limitations in Exhibit 13F, could not perform any work. (R. at 276.) Additionally, Spangler testified that if Warren's testimony were true, she would be unable to perform any work. (R. at 277.) In response to questioning by Warren's attorney, Spangler testified that the assessment of B. Wayne Lanthorn, Ph.D., that "[m]ultiple health problems and somatic complaints may affect her ability to attend work on a reliable basis," would prevent Warren from maintaining employment. (R. at 278.) Lastly, Spangler testified that the moderate mental limitations found by the state agency physicians would prevent Warren from working at any level of exertion. (R. at 279.)

In rendering his decision, the ALJ reviewed medical records from Dr. Patrick Molony, M.D.; Solutions Counseling; Dr. Richard Surrusco, M.D., a state agency physician; Addiction Education Center; B. Wayne Lanthorn, Ph.D.; Dr. Jai Varandani, M.D.; Anne Jacobe, LCSW; Dr. Frank M. Johnson, M.D., a state agency physician; R.J. Milan Jr., Ph.D., a state agency psychologist; Dr. Donald R. Williams, M.D., a

6

state agency physician; and Howard Leizer, Ph.D., a state agency psychologist.

Warren sought treatment from Dr. Patrick Molony, M.D., from May 12, 2003, to September 16, 2005. (R. at 124-50.) On May 12, 2003, Dr. Molony noted that Warren was taking Prempro every other day and that she decided to continue that frequency after discussing the risks and benefits of the medication. (R. at 130.) Dr. Molony diagnosed sleep apnea, anxiety and depression, among other conditions, and refilled Warren's prescriptions for Celexa, Ativan and Prempro.[6] (R. at 130.) Warren returned to Dr. Molony's office on November 26, 2003, and her Prempro dose was reduced, but she was instructed to take the medication daily instead of every other day. (R. at 129.) In addition, Warren was provided refills for her Ativan and Celexa. (R. at 129.) She was diagnosed with anxiety and depression. (R. at 129.)

Warren again presented to Dr. Molony's office on June 23, 2004, for a routine office visit, and she was diagnosed with anxiety. (R. at 128.) On November 23, 2004, she was seen again for a routine examination, was prescribed Ativan, Lexapro and Prempro, and was diagnosed with anxiety. (R. at 127.) On March 10, 2005, Dr. Molony's notes indicate that Warren presented with a "history compatible with depression." (R. at 126.) Warren reported problems with depression in the past, which usually occurred only during the summer, but reported that her current depression started in the winter. (R. at 126.) She complained that she was unable to focus and had difficulty with daily personal needs and grooming. (R. at 126.) She reported quitting her job because of her inability to focus. (R. at 126.) She also reported that Celexa had lost its effectiveness, and that she had been on Prozac for three weeks. (R.

---

[6]Large portions of Dr. Molony's treatment notes are illegible.

7

at 126.) Warren was diagnosed depression and anxiety, and she asked Dr. Molony to refer her to a psychiatrist for possible hospitalization. (R. at 126.)

Warren was treated at Solutions Counseling from March 7, 2005, to November 28, 2006. (R. at 151-76, 228-45.) On an intake assessment dated March 7, 2005, Warren complained of depression, anger, frustration, mood swings and felt that she had no hope for the future. (R. at 171.) Warren also reported that she had previous treatment with Elizabeth Vines for Seasonal Affective Disorder, ("SAD"). (R. at 171.) She reported having family problems in the past, being hospitalized for bulimia and gastric bypass surgery, and that she was currently taking Lexapro, Prozac and Ativan. (R. at 171-72.) She reported that she was raped in 1983. (R. at 172.) Anna B. Jacobe, LCSW, reported that Warren was experiencing moderate to severe depression with suicidal ideations. (R. at 173.) Jacobe's mental status examination revealed that Warren had a depressed mood, racing thought processes, an anxious affect, but that her orientation was intact, she had good judgment/insight and that she had no paranoia or delusions. (R. at 173.) Warren was diagnosed with major depression, while bipolar disorder was ruled out, and her Global Assessment of Functioning, ("GAF"), was assessed at 50.[7] (R. at 173.)

On March 14, 2005, Warren presented to Jacobe with feelings of hopelessness. (R. at 160.) A symptom checklist noted that Warren was severely depressed and was

---

[7]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness," DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER FORTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.). A GAF of 41-50 indicates that the individual has serious symptoms or serious impairments in social, occupational or school functioning. DSM-IV at 32.

8

experiencing severe irritability/anger, moderate to severe crying spells, decreased energy, increased appetite and insomnia. (R. at 160.) Jacobe noted that Warren's attention and concentration was "ok." (R. at 160.) Jacobe's mental status examination revealed that Warren had a depressed mood, racing thought processes, an anxious affect, but that her orientation was intact, she had fair judgment and insight and that she had no paranoia or delusions. (R. at 160.) A treatment plan dated March 14, 2005, revealed that Warren was diagnosed with bipolar disorder, while obsessive-compulsive disorder, ("OCD"), was ruled out, and her GAF was assessed at 50. (R. at 170.)

On March 24, 2005, Warren presented to Jacobe with complaints of increased depression and crying. (R. at 169.) A symptom checklist noted that Warren was severely depressed, had moderate to severe irritability/anger, moderate to severe crying spells, decreased energy and moderate hypersomnia. (R. at 169.) A mental status examination revealed that Warren had a disheveled appearance, a depressed and irritable mood and racing thought processes, but that her orientation was intact, her judgment and insight was fair and she had no paranoia or delusions. (R. at 169.) On April 6, 2005, Warren returned to Jacobe with moderate to severe depression, severe anxiety, moderate to severe crying spells, increased energy and moderate insomnia. (R. at 168.) Warren also reported that she changed medication and was now taking Cymbalta. (R. at 168.) Jacobe's mental status examination revealed that Warren was casually dressed, with a depressed mood, anxious affect and racing thought processes, but that her orientation was intact, her judgment and insight was good and she had no paranoia or delusions. (R. at 168.)

A letter dated April 13, 2005, from the Addiction Education Center, by

9

Elizabeth Vines, a Nationally Certified Addiction Counselor, noted that Warren asked to see Vines because of depression, drastic mood swings and anxiety. (R. at 178.) Vines noted that Warren spent six weeks undergoing inpatient treatment for an eating disorder, and that she continued to suffer from her eating disorder. (R. at 178.) She noted that Warren's medical doctor had treated her with several antidepressant medications, and that she had became incapacitated for months at a time. (R. at 178.) She remarked that Warren "was unable to hold a work position for any length of time [because of] stress, anxiety and depression . . . [and that] [a]t this point she is unable to concentrate or focus on even small tasks long enough to complete them." (R. at 178.)

On April 13, 2005, Warren reported to Jacobe that she was "doing some better." (R. at 158, 167.) A symptoms checklist revealed that Warren had severe depression, anxiety, irritability/anger and crying spells. (R. at 167.) The review also revealed mild to moderate panic attacks, decreased energy, decreased attention and concentration, suicidal ideations and night terrors. (R. at 167.) A mental status examination revealed that Warren was clean and casually dressed, with a depressed mood, anxious affect, racing thought processes and limited judgment/insight, but that her orientation was intact. (R. at 167.) Warren reported no change in self or situation on April 19, 2005, and reported on May 3, 2005, that she was having better days. (R. at 165-66.)

On April 25, 2005, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a consultative examination at the request of the Virginia Department of Rehabilitative Services. (R. at 179-86.) Warren's chief complaints were major depression, obesity and hearing loss. (R. at 179.) Lanthorn noted that Warren

10

presented with a clean and neat appearance. (R. at 179.) Warren reported that she took Prempro, Ativan and Cymbalta. (R. at 180.) Warren reported sleep terrors, as the result of being raped in 1983, and restless leg syndrome. (R. at 180.) She also reported being hospitalized for bulimia. (R. at 181.) Warren further reported that she experienced depression in the summer, which normally improved in the fall. (R. at 182.) She stated that she started a video business, but quit because the job was too overwhelming. (R. at 182.) She reported that she could do household chores, but that it took her a long time to complete chores. (R. at 183.)

Lanthorn noted that Warren was appropriately oriented in all spheres, and that she was cooperative. (R. at 181.) Lanthorn also noted that Warren's affect was labile, and that she had a congruent mood. (R. at 182.) Lanthorn diagnosed Warren with major depressive disorder, single episode, moderate, bulimia nervosa, in current remission, and assessed her current GAF at 60.[8] (R. at 184.) Lanthorn concluded that Warren's intellectual function was above average, but noted that she may have difficulty with more complex tasks due to depression. (R. at 184.) He found that she could maintain simple routine, had good social interaction, could work in proximity to others and could adapt to change. (R. at 184.) He found, however, that multiple health problems and somatic complaints might affect her ability to attend work on a reliable basis. (R. at 184.) He concluded that, with appropriate treatment for her depression, including therapy and antidepressant medication, improvement could be anticipated. (R. at 185.)

Warren reported having both good and bad days on May 17, 2005, and June 1,

---

[8]A GAF of 51-60 indicates that an individual has moderate symptoms or moderate difficulty in social, occupational or school functioning. DSM-IV at 32.

11

2005. (R. at 163-64.) On May 17, 2005, she reported difficulty moderating herself and an inability to complete household chores. (R. at 164.) A symptom checklist indicated moderate to severe depression, irritability/anger and crying spells and decreased energy. (R. at 164.) Jacobe noted that Warren was casually dressed, that her mood was depressed and irritable, that she had racing thought processes, but that her orientation was intact, she had no paranoia or delusions and her judgment and insight was fair. (R. at 164.) On June 1, 2005, a symptom checklist revealed severe depression and irritability/anger and decreased energy. (R. at 163.) Jacobe noted that Warren was cleanly dressed, that her mood was depressed and irritable, that she had racing thought processes, but that her orientation was intact, she had no paranoia or delusions and her judgment and insight was fair. (R. at 163.) On June 15, 2005, Warren reported "some better days." (R. at 162.) Her depression and irritability/anger were noted to be moderate, and she reported decreased energy. (R. at 162.) A mental status examination revealed that Warren was casually dressed, that her mood was depressed, that she had racing thought processes, but that her orientation was intact, she had no paranoia or delusions and her judgment and insight was fair. (R. at 162.)

On June 22, 2005, Dr. Jai K. Varandani, M.D., completed a medical expert report. (R. at 193-97.) Warren presented to Dr. Varandani with depression and reported that she suffered from trauma from a 1983 rape and bulimia. (R. at 193.) She also reported uncontrollable crying spells, forgetfulness and fragmented sleep. (R. at 193-94.) Dr. Varandani reported that Warren was alert and fully oriented. (R. at 195.) He diagnosed Warren with mild to moderate, chronic depression and noted a history of bulimia. (R. at 196.) On June 29, 2005, Warren presented to Jacobe and reported no new problems, but stated that she continued to feel overwhelmed. (R. at 161.)

12

On July 12, 2005, Howard Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form, ("PRTF"), and concluded that Warren had an affective disorder, namely major depression disorder. (R. at 198-212.) Leizer found that Warren was moderately restricted in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 208.) He also noted that she had no episodes of decompensation. (R. at 208.) He concluded that Warren's allegations were partially credible. (R. at 211.) On December 30, 2005, Leizer's findings were reviewed and affirmed by R.J. Milan Jr., Ph.D., a state agency psychologist. (R. at 198.)

On July 12, 2005, Leizer also completed a Mental Residual Functional Capacity Assessment, ("MRFC"). (R. at 213-16.) Leizer concluded that Warren was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and to be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and to respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 213-14.) These findings were reviewed and affirmed by Milan on December 30,

13

2005. (R. at 215.)

On July 25, 2005, Warren presented to Jacobe and noted that she was very busy with her video business. (R. at 157.) A symptom checklist indicated that Warren was experiencing moderate depression, moderate irritability/anger and increased energy. (R. at 157.) Jacobe noted that Warren was casually dressed, that her mood was depressed and that she had racing thoughts, but indicated that her orientation was intact, her judgment and insight was good and she had no paranoia or delusions. (R. at 157.) On August 11, 2005, Warren reported that she was denied disability, and that she continued to be depressed. (R. at 156.) A symptom checklist indicated severe depression, obsessions, moderate irritability/anger and decreased energy. (R. at 156.) Jacobe's examination revealed that Warren was casually dressed, that her mood was depressed, with an anxious affect and racing thought processes, but that her orientation was intact, her judgment and insight were fair and that she experienced no paranoia or delusions. (R. at 156.) Warren verbalized feeling unprotected during the summer. (R. at 156.)

On August 24, 2005, Warren was described as being disheveled, having an irritable and depressed mood, an anxious affect, with racing thought processes, but it also was noted that her orientation was intact, her judgment and insight were fair and she had no paranoia or delusions. (R. at 155.) Warren continued treatment with Jacobe during visits on September 2, September 13 and October 7, 2005. (R. at 152-54.) These visits revealed similar symptoms and assessments. (R. at 152-54.) On September 2, 2005, Jacobe noted that Warren's thought processes were slowed and that she was having a "sad day." (R. at 154.) On September 13, 2005, Warren

14

reported low energy, and explained that she felt "raw and exposed," but that she enjoyed her video work. (R. at 153.) On October 7, 2005, Warren reported no major changes, and stated that she was looking forward to winter. (R. at 152.) Jacobe diagnosed Warren with bipolar disorder. (R. at 152.)

On October 18, 2005, Warren reported "feeling overwhelmed" and "easily distracted." (R. at 245.) Jacobe noted that Warren reported moderate depression, mild irritability/anger and decreased energy, attention and concentration. (R. at 245.) Jacobe's mental status examination revealed that Warren was casually dressed, her mood was depressed and irritable, her thought processes were racing, but that her orientation was intact, her judgment and insight were fair and that she suffered from no paranoia or delusions. (R. at 245.) On November 2, 2005, Warren reported that she felt achy, tired and depressed. (R. at 244.) A symptom checklist indicated moderate depression, irritability/anger and crying spells and decreased energy. (R. at 244.) Jacobe's mental status examination revealed similar symptoms. (R. at 244.) On February 24, 2006, Warren reported that she was "not doing well," and that the "trip was horrible." (R. at 243.) Warren reported that she was severely depressed, had moderate irritability/anger and crying spells, decreased energy and increased appetite. (R. at 243.) Jacobe's mental status examination revealed that Warren was casually dressed, her mood was depressed and irritable, her affect was anxious and she had racing thought processes, but that her orientation was intact, she had good judgment and insight and no paranoia or delusions. (R. at 243.)

On March 16, 2006, Warren reported "doing o.k. with videos," but that she was worried about her health. (R. at 242.) A symptom checklist indicated moderate

Case 2:08-cv-00003-GMW-PMS   Document 14   Filed 08/08/08   Page 15 of 24   Pageid#: 73

depression, irritability/anger and panic attacks and increased energy. (R. at 242.)
Jacobe reported that Warren was casually dressed, that her mood was depressed, her
affect was anxious and her thought processes were racing, but that her orientation was
intact, she had fair judgment and insight and no paranoia or delusions. (R. at 242.) On
March 27, 2006, Warren reported mild depression, moderate irritability/anger and
increased energy. (R. at 241.) Jacobe noted a depressed mood, a subdued affect, but
that Warren's orientation and thought processes were intact, she had good judgment
and insight and no paranoia or delusions. (R. at 241.) From April 17, 2006, to June
30, 2006, Warren reported doing "o.k." (R. at 234-40.) On July 27, 2006, she reported
increased conflicts at home, and she attended her therapy session with her spouse. (R.
at 233.) She reported moderate depression and anxiety and mild irritability/anger. (R.
at 233.) Jacobe's mental status examination revealed that Warren was experiencing a
depressed mood and an anxious affect, but that her orientation and thought processes
were intact, she had good judgment and insight and no paranoia or delusions. (R. at
233.)

On August 18, 2006, Warren reported that work was "doing o.k.," and she
reported mild depression and irritability/anger, accompanied by increased energy and
appetite. (R. at 232.) Jacobe noted that Warren was disheveled, with a depressed
mood and subdued affect, but that her orientation and thought processes were intact,
she had good judgment and insight and no paranoia or delusions. (R. at 232.) Warren
reported that she was experiencing stress on September 14, 2006, because of the death
of a close friend. (R. at 231.) At that time, she also reported moderate depression and
anxiety. (R. at 231.) Jacobe's examination found her to be disheveled, with slowed
thought processes, a depressed mood and an anxious affect. (R. at 231.) Warren

reported increased anxiety on September 26, 2006, and stated that she was "all confused inside." (R. at 230.) On October 18, 2006, Warren reported having problems with her son at school and that she was experiencing moderate depression, anxiety, irritability/anger, crying spells and decreased energy. (R. at 229.) Jacobe noted that Warren was depressed, irritable and angry and had racing thought processes, but that her orientation was intact, she had fair judgment and insight and she had no paranoia or delusions. (R. at 229.) On November 28, 2006, Warren presented to Jacobe with her son and reported that she was concerned about his in school suspension. (R. at 228.) She also reported that she was experiencing moderate depression, mild irritability/anger and decreased energy. (R. at 228.)

On January 8, 2007, Jacobe completed a Mental Residual Functional Capacity Questionnaire. (R. at 223-27.) Jacobe reported that Warren was diagnosed with bipolar disorder and had a current GAF of 60. (R. at 223.) Jacobe indicated that Warren had a seriously limited, but not precluded, ability to understand, remember and carry out very short and simple instructions, to make simple work-related decisions and to deal with normal work stress. (R. at 225.) She indicated that Warren was unable to meet competitive standards in her ability to remember work-like procedures, to maintain attention for two hour segments, to maintain regular attendance and to be punctual within customary, usually strict tolerances, to sustain an ordinary routine without special supervision, to perform at a consistent pace without an unreasonable number and length of rest periods, to ask simple questions or request assistance, to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, to respond appropriately to changes in a routine work setting and to be aware of normal hazards and to take appropriate precautions. (R. at 225.) Jacobe

17

also indicated that Warren had no useful ability to function in her ability to work in coordination with or proximity to others without being unduly distracted, to complete normal workday and workweek without interruptions from psychologically based symptoms and to accept instructions and to respond appropriately to criticism from supervisors. (R. at 225.) Jacobe indicated that Warren had no useful ability to understand, remember and carry out detailed instructions, that she was unable to meet competitive standards necessary to set realistic goals or to make plans independently of others, to deal with stress of semiskilled and skilled work, to interact appropriately with the general public and to adhere to basic standards of neatness and cleanliness. (R. at 226.) Jacobe further opined that Warren had a seriously limited, but not precluded, ability to maintain socially appropriate behavior, to travel in unfamiliar places and to use public transportation. (R. at 226.) Jacobe reported that Warren had a "history of difficulties on work sites." (R. at 227.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2008); *see also Heckler v. Campbell*, 471 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2008).

18

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. If the claimant is able to establish a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 16, 2007, the ALJ denied Warren's claim. (R. at 16-24.) The ALJ found that Warren met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2009, and that she had not engaged in substantial gainful activity since May 31, 2004, the alleged onset date. (R. at 18.) The ALJ determined that the medical evidence established that Warren suffered from a severe impairment, namely a depressive disorder; however, he found that Warren did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ found that Warren retained the residual functional capacity to perform simple work at the medium level of exertion. (R. at 19.) Further, the ALJ determined that Warren was unable to perform her past relevant work as a day care director, a town clerk or a secondary teacher. (R. at 22.) Thus, the ALJ concluded that Warren was not under a disability as defined in the Act, and that she was not entitled to benefits. (R. at 24.). *See* 20 C.F.R. § 404.1520(g) (2008).

19

Warren argues that the ALJ's decision was not supported by substantial evidence. (Brief in Support of Plaintiff's Motion for Summary Judgment, ("Plaintiff's Brief"), at 8-17.) In particular, Warren argues that the ALJ erred in determining her mental residual functional capacity because he did not give the proper weight to the opinions of her mental healthcare professionals. (Plaintiff's Brief at 9-17.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). The ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to the evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently

20

explains his rationale and if the record supports his findings.

The court agrees with Warren's argument that the ALJ erred in determining her mental residual functional capacity. In the ALJ's opinion, he states that he "gives great weight to the opinions of the medical experts, [] Lanthorn and the [s]tate [a]gency [p]hysicians[9] in finding that the claimant has the residual functional capacity to perform simple work at the medium level of exertion. (R. at 22.) However, the ALJ fails to explain why he rejects many of the moderate limitations found by state agency psychologists Leizer and Milan. In the PRTF completed by Leizer and Milan, they found that Warren was moderately restricted in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 198-212.) In the MRFC completed by Leizer and Milan, they also concluded that Warren was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and to be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and to respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 213-14.) While the ALJ's residual functional capacity incorporates some of these

---

[9]The ALJ appears to use the term "physician" broadly to encompass both the state agency medical doctors and psychologists.

moderate limitations by limiting Warren to simple work, it does not incorporate, among others, those involving Warren's ability to interact with the public, her ability to complete a normal workweek and those limitations involving Warren's ability to adapt to changes in the work setting. However, Spangler, the vocational expert at Warren's hearing, testified that the moderate mental limitations found by the state agency physicians would prevent Warren from working at any level of exertion. (R. at 279.) The ALJ's decision cannot be supported by substantial evidence when he fails to adequately explain his rationale for rejecting the opinions of those whom he otherwise gave great weight to in arriving at his decision.

An ALJ has a duty to weigh the evidence in order to resolve any conflicts which may appear therein, and the ALJ in this case has failed to do so. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Indeed, the ALJ has a duty to indicate explicitly that he has weighed all relevant evidence, indicate the weight given to this evidence and sufficiently explain his rationale in crediting the evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). In this case, the ALJ fails to explain why he did not incorporate the limitations noted by the state agency healthcare professionals into his residual functional capacity finding.

In addition, while the ALJ "gives great weight" to Lanthorn's opinion, he does not discuss or indicate any reason why he disagrees with Lanthorn's assessment that "[m]ultiple health problems and somatic complaints may affect [Warren's] ability to attend work on a reliable basis." (R. at 184.) However, Spangler testified that Lanthorn's assessment regarding Warren's reliability would prevent Warren from maintaining employment. (R. at 278.) Before this court can determine whether

Case 2:08-cv-00003-GMW-PMS   Document 14   Filed 08/08/08   Page 22 of 24   Pageid#: 80

substantial evidence supports an administrative determination, the Commissioner must discharge his duty to properly consider and weigh all relevant evidence, and here, the Commissioner has not. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439 (4th Cir. 1997) (citing *Jordan v. Califano*, 582 F.2d 1333, 1335 (4th Cir. 1978)). As a result, this court cannot determine if the Commissioner's findings are supported by substantial evidence. On remand, the Commissioner must sufficiently explain his rationale in crediting relevant and probative evidence.

The court expresses no opinion as to the conclusions that should be drawn from the evidence of record; however, Warren is entitled to have all relevant evidence properly considered and to have the Commissioner explain how he treated it in arriving at his conclusion. I find that substantial evidence does not exist in the record to support the Commissioner's finding, specifically with regard to Warren's mental residual functional capacity.

*IV. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and this case will be remanded to the Commissioner for further consideration.

An appropriate order will be entered.

23

**ENTER**: This _3th_ day of August 2008.

_Glen M. Williams_

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE